MURPHY & DIMOND *vs.* WINCHESTER.

The defendant, having contracted with B. to build and finish for him (the defendant) a dwelling house, for which B. was bound to furnish the mantels, addressed a note to B. saying, "I want mantels for my house precisely like those ordered by Mr. Burton from Messrs. Murphy & Dimond; also tiling. Will you have the same ordered, at once." This note was delivered by B. to the plaintiffs, who furnished the mantels, and the same were sent to the defendant's house and put into it. *Held* that the plaintiffs had no right to treat the paper as an order addressed to them, nor to rely upon it as the evidence of B.'s authority as the defendant's agent. That there was no contract between the plaintiffs and defendant, and the latter was not liable for the goods.

APPEAL from a judgment entered upon the report of a referee. The action was brought to recover the price of some marble mantels, tiling, &c. sold and delivered by the plaintiffs. The point in controversy was, to whom they were sold and delivered; whether to the defendant or to one Warren Beman. The defendant owned a house in Fifth avenue, New York, which was unfinished. Among other things it wanted mantels, marble tiling, and other marble goods. His friend Mr. Burton owned a house on Thirty-seventh street, for which mantels, tiling, &c. were being made by the plaintiffs. The defendant wished to have similar mantels and tiling prepared for his house. He wrote to Beman, who was finishing his house, for him, to order them of the plaintiffs, in the following terms:

"Warren Beman, Esq.,

Dear Sir: I want mantels for my house precisely like those ordered by Mr. Burton from Messrs. Murphy & Dimond. Also, tiling. Will you have the same ordered at once?          Yours,

L. W. WINCHESTER.

New York, June 14th, 1857."

Beman, before the receipt of this letter, had called on the plaintiffs and had a conversation with them about furnishing those goods for the defendant's house, and had told them "Mr. Winchester would probably adopt the same mantels"

as Burton had ordered. After telling them so, he called on the defendant and got from him the above letter, which he calls an "order." This letter, or order, he either gave or sent to the "plaintiffs" immediately after he obtained it. The plaintiffs proceeded to make the mantels and goods, and they were sent to the defendant's house, then in process of construction, and put into it. The defendant, shortly after the letter was given to the plaintiffs, called on them and inquired if Beman had ordered mantels for his house. Murphy at once inquired, "Is this Mr. Winchester?" To which the defendant replied that it was, and that he wished to see the style of the mantels. The defendant saw samples of the mantels, and told the plaintiffs that he was pleased with them. He then reminded the plaintiffs that they had his order for the goods, and urged them "to hurry up with them." One of the mantels, worth $75, was by his direction exchanged, and its place filled by one worth $110. The defendant told the plaintiffs, at this time, that *his* payments would come through Beman.

The referee made a report in favor of the plaintiffs, and the defendant appealed from the judgment.

————, for the appellant.

*Lewis Hurst* and *C. A. Peabody*, for the respondents.

*By the Court,* MULLIN, J. To entitle the plaintiffs to recover in this case against the defendant, they must prove a contract, express or implied, between them and the defendant, by which the one party agreed to purchase and the other to sell the mantels which are the subject matter of this suit, and that they have been delivered in accordance with the contract. The plaintiffs do not rely on an implied agreement. They undertook to prove before the referee an express contract, and the prominent question for us, on the appeal, is whether such a contract is proved.

In examining this question, it is essential that we should bear in mind, that the defendant had contracted with Beman to build and finish two houses in this city according to certain plans and specifications. By this contract Beman was bound to furnish the mantels. This being so, no reason can be assigned why the defendant should bind himself to pay for the mantels, first to Beman and again to the plaintiffs. No agreement was ever made between the plaintiffs and the defendant personally. If it was made at all, it was through Beman his own agent, unless the order, exhibit A, is to be treated as an order on the plaintiffs for the mantels. That order is in these words:

"Warren Beman, Esq.,

     Dear Sir: I want mantels for my house precisely like those ordered by Mr. Burton from Messrs. Murphy & Dimond. Also, tiling. Will you have the same ordered at once.                 Yours, &c.

                         L. W. WINCHESTER."

It will be perceived that this order, if such it is, is not addressed to the plaintiffs, but to Beman. It is not therefore an order on the plaintiffs, and not of itself evidence of a contract to purchase and pay for the matels. If we are to give any effect to this paper, it can only be as evidence of the authority of Beman to purchase the mantels. Was it the intention of the defendant, when he wrote this document, to give to Beman any such authority? Most clearly not. No reason or motive can be assigned for so doing. If, then, the defendant can be held bound by the act of Beman it must be because, by the reasonable construction of the writing, Beman is constituted his agent, or the latter is estopped from disputing his authority. There is nothing ambiguous in the terms of the writing. Read in the light of the contract between the defendant and Beman, it is only a request to Beman to procure the mantels to be prepared at an early day. There is nothing in the language which was calculated to

Murphy *v.* Winchester.

impose upon or mislead the plaintiffs. They had no right to treat the paper as an order addressed to them, nor to rely upon it as the evidence of Beman's authority. It was their duty to ascertain the nature and extent of his power, and if they had inquired, we are to presume that Beman would have told them the truth; and when all the facts were disclosed, it would have been quite apparent that the defendant never intended to become responsible for the mantels. Up to the delivery of the order, the defendant had done nothing in reference to the mantels but send the writing, exhibit A, to Beman. It was after Beman had given the writing to the plaintiffs, and before any personal interview between the plaintiffs, or either of them, and the defendant, that the contract is shown to have been made.

I can find nothing in the subsequent acts of the defendant which, fairly interpreted, manifest any intent on his part to become bound for the mantels, or that the plaintiffs intended to hold him responsible, before the irresponsibility of Beman was ascertained. The only circumstance which seems to me of any significance is the payment of the money. But I do not find that the defendant ever paid a penny to the plaintiffs, directly, nor did he hand it to Beman to be carried to them as money paid by him. On the contrary, Beman says he paid the money, taking the plaintiffs' receipt therefor, and gave his own receipt to the defendant for the sums delivered to him. To estop the defendant from denying the authority of Beman, he must be shown to have done something which would justify the plaintiffs in treating Beman as his agent, on which the plaintiffs acted. No such thing is proved. If the plaintiffs have acted on the idea that the defendant was the person to pay them for the mantels, it was by reason of their omission to make those inquiries which every prudent man should make in dealing with a person professing to act as another's agent. I cannot resist the conclusion that, if Beman had continued solvent, the defendant would never have been called on for pay for the mantels. But his insolv-

ency cannot, in morals or in law, subject the defendant to liability on a contract he never made.

For these reasons, without examining the other questions raised on the argument, I am of the opinion that the judgment of the referee should be reversed and a new trial ordered, costs to abide the event.

The referee having once passed upon the facts in this case, and as the judgment is reversed by reason of the erroneous findings of fact by him, it is no more than just to the defendant that the case should go to another referee, whose mind has acquired no bias or prejudice against his side of the case. In appointing a new referee, we must not be understood as imputing any improper prejudice or bias to the referee who has already heard this case. But a new referee is appointed on the same grounds, and for the same reasons, which require a new jury to re-try a cause in which a verdict has been had and a new trial ordered. No lawyer would consent that the first jury, or any members of it, should sit at the second trial.

A new trial is therefore ordered; costs to abide the event.

[New York General Term, November 4, 1861. *Clerke, Sutherland* and *Mullin,* Justices.]